**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL RAILROAD PASSENGER CORPORATION** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.   17-1752** |
| | : | |
| **4.0446 ACRES MORE OR LESS OF LAND AND FIXTURES and PPL ELECTRIC UTITLTIES CORP.** | : | |
| | : | |
| | : | |

**MEMORANDUM**

**SCHMEHL, J.  s/s JLS**                                                    **March 6, 2019**

This is a Complaint for Condemnation and Declaration of Taking brought by National Railroad Passenger Corporation ("Amtrak") pursuant to 49 U.S.C. § 24311. Amtrak seeks to condemn an electric power substation located in Lancaster County, Pennsylvania, known as the Conestoga Substation. Prior to this condemnation, fee title to the Conestoga Substation was owned by defendant PPL Electric Utilities Corp. ("PPL").  As required by 49 U.S.C. § 24311(b)(1), Amtrak filed a declaration of taking (a) stating "the public use for which the interest is taken"; (b) describing the property; (c) stating the interest in the property; (d) "showing the interest taken"; and (e) estimating just compensation for the interest taken. See Decl. of Taking (ECF 4.) Amtrak also deposited $2 million with the Court as an estimate of just compensation. (*Id.* ¶ 19.) By the parties' stipulation, discovery was bifurcated into two phases. (ECF 25.) The first phase was limited to Amtrak's authority to condemn the Substation. (*Id.*) The second phase, if necessary, will address the value of the Substation and the estimated just compensation. (*Id.*) Presently before the Court is Amtrak's motion for partial summary

1

judgment on the issue of Amtrak's authority to condemn the Substation and PPL's cross-motion for summary judgment. For the reasons that follow, Amtrak's motion is granted and PPL's motion is denied.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The parties have stipulated to the following facts ("SOF"):

## I. THE PARTIES

1. Amtrak is a corporation that was authorized to be created by the Rail Passenger Service Act of 1970, 49 U.S.C. § 24101 et seq., located at One Massachusetts Avenue, NW, Washington, DC 20001. (Doc. 1, ¶ 1).

2. PPL is a Pennsylvania corporation with its principal place of business at 2 North Ninth Street, Allentown, Pennsylvania 18101. (Doc. 1, ¶ 6; Doc. 19, ¶ 6).

3. PPL is a public utility regulated by the Pennsylvania Public Utility Commission ("PUC") under the Pennsylvania Public Utility Code, 66 Pa.C.S. § 101 et seq., and by the Federal Energy Regulatory Commission ("FERC") under the Federal Power Act, 16 U.S.C. § 791a et seq. (Doc. 19, ¶ 6; Deposition Transcript of Eric Hornung, Feb. 22. 2018 at 102:21-23).

## II. THE SUBJECT PROPERTY

4. Before the filing of this condemnation action, PPL was the owner in fee simple of the land parcel and the improvements thereon at Powerhouse Road, Manor Township, Lancaster County, Pennsylvania, tax parcel 410-11106-0-0000, which was conveyed via the Special Warranty Deed attached to the Complaint as Exhibit A and recorded as Instrument number 6206115 (the "Tax Parcel"). (Doc. 1, ¶ 7).

5. The premises acquired is that portion of the Tax Parcel which is approximately 575 feet in width and 380 feet in depth, comprising 4.0446 acres, and which comprises the Conestoga Substation power station (the "Conestoga Substation"). (Doc. 1, ¶ 8).

6. The Conestoga Substation is an electrical power substation that is directly connected to the Safe Harbor Hydroelectric Facility ("Safe Harbor") and that receives power at 25 Hertz for Amtrak's use. (Deposition Transcript of Jeffrey Byrnes, Feb. 14, 2018, SOF, Exhibit B at 25:12-21, 33:19-23; Deposition Transcript of Eric Hornung, Feb. 21, 2018, SOF, Exhibit C at 16:20-17:24).

7. The 25 Hertz power flows from Safe Harbor to the Conestoga Substation. Any power not consumed by Amtrak then flows through a frequency converter owned by Safe Harbor, where it is converted to 60 Hertz, and then back to Safe Harbor and on to the Manor Substation owned by PPL. (Ex. B at 35:15-36:1).

8. The power that is not used by Amtrak and flows back to the Manor Substation is sold on the PJM market. (Ex. B at 35:15-36:1; Ex. A at 100:20-101:10).

9. PJM is the regional transmission organization that has functional control of the electricity grid for a fourteen state region.  *See* www.pjm.com

10. The Conestoga Substation receives power generated from Safe Harbor at the voltage of 13.2 kV. (Ex. B at 38-39; Deposition Transcript of Stephen Gelatko, Feb. 20, 2018, SOF, Exhibit D at 132:12-14).

11. After the power enters the Substation, it is "stepped up" from 13.2 kV to 138 kV. (Ex. B at 34:9-12; Ex. D at 118:22-24, 119:1).

12. The Conestoga Substation was built in 1934. (Doc. 19, ¶ 7).

13. Until the filing of the Declaration of Taking in this matter, PPL, through its predecessors, owned the fee interest in the Conestoga Substation since it was built in 1934. (Doc. 19, ¶ 7).

14. Amtrak is the only PPL customer served by the 25 Hertz power from the Conestoga Substation. (Ex. B at 30:2-4, 34:5-7; Ex. D at 27:5-10, 118:22-24, 119:2-4).

15. Amtrak uses the 25 Hertz power from the Conestoga Substation to power the south end of its Northeast Corridor ("NEC") and its Harrisburg Line. (Ex. B at 33:24, 34:1-7; Ex. D at 119:11-14, 120:16-19; see also Deposition Transcript of Andrew Dunbar, Feb. 13, 2018, SOF,Exhibit E at 52:1-24, 53:1-8).

16. The NEC is the busiest rail passenger route in North America. (Deposition Transcript of William Bartlett Bush, Feb. 16, 2018, SOF, Exhibit F at 21:12-18).

17. Amtrak operates up to 157 trains on the NEC each day. (Ex. A at 114:16-20).

18. The Conestoga Substation has served Amtrak's railroad operations since Amtrak commenced operations on the NEC. (Hornung-21, SOF, Exhibit G).

19. The Substation has seven active transformers. Prior to the condemnation, Amtrak owned three of the transformers, and PPL owned four. (Ex. B at 30:5-24, 31:1).

20. Power from the Conestoga Substation is delivered to Amtrak via seven transmission lines that emanate from the Substation. (Ex. B at 34:13-21).

21. Amtrak is the owner of three of these transmission lines, which transport power directly to Amtrak's electric traction network. (Ex. B at 28:12-29:4, 34:18-24, 35:1-11).

22. The remaining four transmission lines are owned by PPL, and also transport power directly to Amtrak's electric traction network. (Ex. B at 34:18-24, 35:1-11).

23. Of the seven total lines, four of the lines that exit the Conestoga Substation feed Amtrak's NEC mainline at Perryville, Maryland; two lines feed Amtrak's Harrisburg line at Parkesburg, Pennsylvania; and 5 146:16; Doc. 1, Ex. D).

24. The four lines that feed Amtrak's facilities in Perryville, Maryland are owned and maintained by PPL from the Conestoga Substation to the Pennsylvania/Maryland border. Once in Maryland, all four lines are owned and maintained by Baltimore Gas and Electric. (Ex. B at 35:5-11).

25. Prior to this condemnation, Amtrak paid PPL a tariff rate approved by the PUC for the service PPL provides through the Conestoga Substation. (Ex. B at 30:2-4, 34:5-7; Ex. D at 27:5-10, 118:22-24, 119:2-4)).

26. PPL is a party to an Interconnection Service Agreement among PPL, PJM Interconnection, LLC, and Safe Harbor Water and Power Corporation. (Ex. D at 40:17-20, 132:21-138:12; Doc. 1, Ex. E).

27. PPL is also a party to a Transmission Contract among PPL, Safe Harbor Water and Power Corporation, and Baltimore Gas and Electric Company. (Ex. D at 42:12-15, 144:5-146:16; Doc. 1, Ex. D).

28. At the time that Amtrak filed the Declaration of Taking, the Conestoga Substation provided approximately 22% of the power for Amtrak's operation of the south end of the NEC. (Doc. 1, ¶ 22).

29. Most of the equipment installed at the Conestoga Substation is from the 1930s and quite deteriorated. (Ex. B at 40:2-8; Ex. D at 22:16-24, 23:1-8).

30. In the event of an equipment failure at the Conestoga Substation, Amtrak has no substitute for the power provided by the Conestoga Substation. (Ex. D at 33:1-4).

31. Prior to the condemnation, Amtrak had access to the Conestoga Substation, and PPL and Amtrak were responsible for maintaining their own transformers. (Ex. B at 13:5-20, 14:16-19).

32. Amtrak generally performed its own repairs on Amtrak-owned equipment. (Ex. A at 108:4-18).

## III. INTERACTIONS BETWEEN THE PARTIES REGARDING THE SUBSTATION

33. In January 2010, PPL inquired whether Amtrak would be willing to purchase the Conestoga Substation for $1.7 million. (Byrnes-3, SOF, Exhibit H; Ex. C at 30-33).

34. Amtrak declined the offer. (Ex. C at 33:15-18, 44-45).

35. From 2011 through 2015, Amtrak paid a monthly customer charge to PPL of $37,100 per month for the service it received from PPL through the Conestoga Substation under a tariff approved by the PUC (the "LPEP Tariff"). (Ex. B at 50:8-13).

36. Amtrak is the sole PPL rate payer subject to the LPEP Tariff.

37. The LPEP Tariff included the cost to maintain the site, recoupment of the cost of investments PPL made at the site (including the upgrades), return on those investments, taxes PPL paid, and depreciation. (Ex. D at 33:17-24, 34:1-7; Ex. E at 16-24, 59:1-3).

38. The monthly customer charge paid by Amtrak to PPL is for electric distribution service provided by PPL to Amtrak through the Conestoga Substation. (Ex. E 158:18-24, 159:18-24, 160:1-14).

39. The LPEP Tariff does not include the purchase of electricity. (Ex. E 158:18-24, 159:18-24, 160:1-14).

40. In or around 2011, PPL informed Amtrak that it had begun taking steps to upgrade the deteriorated equipment at the Conestoga Substation, including research and procurement of long lead materials that would be needed for any upgrade. (Ex. B at 17:9-17, 40:9-18; Ex. D at 25:4-8; Ex. C at 35:4-10).

41. Amtrak and PPL agree that upgrades are necessary. (Ex. C at 35-36).

42. The upgrades that are needed include the replacement of transformers, circuit breakers, and the control house. (Ex. C at 34:7-19).

43. Because Amtrak was the sole rate payer for the Conestoga Substation, Amtrak was responsible for the cost of the upgrades under the LPEP Tariff. (Ex. D at 27:2-10, 28:11-24; Byrnes-8, SOF, Exhibit I, ¶ 3).

44. Between approximately 2011 and 2015, PPL and Amtrak had weekly meetings regarding the proposed upgrades. (Ex. B at 22:9-23, 42:8 7 monthly customer charge from $37,100 to $252,000 (the "Rate Case"). (Ex. B at 50:2-7; Ex. F at 72:13-23; Ex. C at 45:17-46:1).

45. During those four years of meetings, PPL and Amtrak discussed the scope of upgrades, as well as options for funding the upgrades. (Ex. B at 22, 42; Ex. D at 30-33).

46. Amtrak and PPL did not come to an agreement on how to fund upgrades to the Conestoga Substation. (Ex. C at 45:17-24, 46-47).

47. In 2015, PPL initiated rate proceedings before the PUC to adjust Amtrak's monthly customer charge from $37,100 to $252,000 (the "Rate Case"). (Ex. B at 50:2-7; Ex. F at 72:13-23; Ex. C at 45:17-46:1).

48. The proposed rate of $252,000 per month would not go into effect until the upgrades were completed and represented a $2.6 million annual increase in Amtrak's operating expenses. (Ex. F at 72:18-23).

49. PPL asserted before the PUC that it required an increased rate based on the capital improvements it proposed at the Conestoga Substation, which at that time PPL projected would cost $18 million. (Ex. B at 50:14-17, 54:9-14).

50. The new rate was comprised of the same components as the rate that Amtrak had been paying from 2011 through 2015 (i.e., the cost to maintain the site, recouping cost of investments made at the site, return on those investments, taxes, and depreciation), which would increase as a result of the upgrades. (Ex. D at 33:17-24, 34:1-7; Ex. E at 16-24, 59:1-3, 85:1-14; Ex. C at 84:6-85:8).

51. Amtrak intervened in the Rate Case and opposed PPL's requested rate increase. (Ex. C at 46:18-21; Ex. B at 69:9-12).

52. In September 2015, Amtrak and PPL reached a settlement of the Rate Case on the following basis: a. Amtrak agreed to pay PPL a monthly rate of $126,323.59 until September 1, 2016 or until the parties agreed upon a new rate. (Ex. B at 69:13-16, 78:22- 24, 79:1; Ex. I, ¶¶ 6, 7). . That rate consisted of the previous monthly customer charge of $37,100, plus a charge of approximately $89,000 as an advance payment to PPL relating to proposed upgrades. (Ex. B at 79-81; Ex. I, ¶ 6). The Settlement Agreement required both parties: [T]o continue to work together to resolve all open issues regarding the upgrade of the Conestoga Substation, including possible alternative resolution regarding the final scope, timing, and costs of the upgrades needed for the Conestoga Substation. Both parties agree to consider all potential

solutions, including, but not limited to, direct funding by Amtrak, purchase of the Conestoga Substation by Amtrak, recovery of costs through base rates, and/or transfer of 2 existing Amtrak transformers from the Metuchen Station to the Conestoga Substation. (Ex. I, ¶ 7).

53. The Settlement Agreement further provided: If PPL Electric and Amtrak are unable to reach an agreement by September 1, 2016, PPL Electric will undertake all improvements needed for the Conestoga Substation that are in its opinion necessary or proper to provide safe and reliable service to Amtrak, and will make an appropriate tariff filing to fully recover those costs. PPL Electric agrees to serve Amtrak with an electronic copy of the tariff filing upon submission to the Pa. PUC. Amtrak reserves all rights to contest the tariff filing before the Pa. PUC. (Ex. I, ¶ 9).

54. The Settlement Agreement further provided: PPL and Amtrak agree that substantial upgrades to PPL Electric's facilities at the Conestoga Substation are required to provide reasonably continuous, reliable, and safe service to Amtrak. (Ex. I, ¶ 1).

55. After the execution of the Settlement Agreement, the parties held an in-person meeting on October 28, 2015 at PPL's offices in Allentown, Pennsylvania, during which they discussed how to move forward with negotiations. (Ex. B at 89:11-24; Ex. D at 48:3-14, 56:15- 24, 57:1-10; Byrnes-9, SOF. Exhibit J).

56. After that initial meeting, representatives from PPL and Amtrak met approximately every two weeks to continue negotiating a resolution. (Ex. B at 100:21-22; Ex. D at 63:10-16).

57. These meetings entailed discussion on both sides as to how to fund upgrades to the Conestoga Substation. (Ex. B at 86-139; Ex. A at 9-50).

58. The primary difference in the parties' positions was that Amtrak wanted to fund the upgrades through a one-time direct capital contribution (sometimes referred to as a "contribution in aid of construction" or "CIAC" payment), and PPL wanted to recover its costs through monthly rate payments that would provide it with a return on its investment. (Ex. D at 63:10-24; Ex. B at 98:4-24, 99:1-2, 104:17-24, 105:4-9 (explaining that accepting a CIAC payment "is detrimental to PPL's business model" because if "[PPL] accepts that capital contribution, zero of that capital goes into rate base, and [PPL] lose[s] [its] opportunity for any return"); Ex. F at 79:23-24, 80:1-12, 83:9-22; Ex. E at 156:9-22).

59. PPL did not want to accept Amtrak's proposal of a capital contribution, rather than a rate adjustment overseen by the PUC, because of PPL's status as a public utility. (Ex. A at 11:1-13; Ex. B at 98:13-99:2; Ex. D at 96:24-97:12).

60. As a public utility, the PUC-approved rate adjustment was PPL's only opportunity to make any money from the project. (Ex. A at 11:10-13; Ex. B at 98:13-99:2, 105:4-9).

61. In or around May 2016, PPL notified Amtrak that PPL had increased its projection of total upgrade costs from $18 million to $24 million. (Ex. E at 125:1-5; Ex. D at 68:12-20; 166:7-12; Ex. C at 38:9-14).

62. The parties continued to negotiate and to exchange written proposals for the upgrades. (Ex. B at 122-129; Byrnes-13, SOF, Exhibit K; Byrnes-14, SOF, Exhibit L).

63. In July 2016, Amtrak requested that PPL provide a price at which it would willing to sell the Conestoga Substation to Amtrak. (Ex. B at 124; Byrnes-15, SOF, Exhibit M; Ex. E at 134).

64. PPL did not convey a price to Amtrak. (Ex. D at 72-77).

65. PPL determined that it would not agree to sell the Substation to Amtrak. (Ex. E at 134:9-20, 163:1-18; Ex. D at 101:1-13; Ex. F at 83:9-24, 84:1-3; Ex. A at 73:2-15; Hornung-25, SOF,Exhibit N).

66. "PPL Electric is not in the business of selling its electric facilities to customers." (Gelatko-7, SOF, Exhibit O; Ex. D at 101:14-102:14).

67. Amtrak and PPL were unable to reach a final agreement by September 1, 2016. (Ex. B at 139:21-24, 140:1; Ex. E at 103:2-7).

68. On October 5, 2016, PPL filed a tariff with the PUC to adjust Amtrak's customer charge for the Conestoga Substation (formally known as the "LPEP rate schedule"). (Supplement No. 213, Pennsylvania Public Utility Commission v. PPL Electric Utilities Corporation Supplement No. 213 to Tariff Electric P.A. PUC No. 201 for Rate Schedule LPEP, Docket No. R-2016-2569975 (Oct. 5, 2016); Ex. B at 142:2-7; Ex. E at 103:2-12; Ex. C at 89- 90).

69. In that filing, PPL sought the PUC's permission to increase the LPEP rate schedule from the 2011-2015 PUC-adjudicated rate of $37,100 per month to approximately $319,000 per month. (Supplement No. 213, Pennsylvania Public Utility Commission v. PPL Electric Utilities Corporation Supplement No. 213 to Tariff Electric P.A. PUC No. 201 for Rate Schedule LPEP, Docket No. R-2016-2569975 (Oct. 5, 2016)).

70. Amtrak filed a Formal Complaint challenging that rate increase on December 19, 2016. (Formal Complaint, National Railroad Passenger Corporation v. PPL Electric Utilities Corporation, Docket No. C-2016-2580526 (Dec. 19, 2016)).

71. In that Complaint, Amtrak stated that it anticipated acquiring the Conestoga Substation by eminent domain instead of litigating PPL's tariff filing before the PUC. (Id.)

72. In that action, the PUC suspended the effectiveness of any rate increase until at least October 1, 2017. (Opinion and Order, Pennsylvania Public Utility Commission v.

PPL Electric Utilities Corporation Supplement No. 213 to Tariff Electric P.A. PUC No. 201 for Rate Schedule LPEP, Docket No. R-2016-2569975 & National Railroad Passenger Corporation v. PPL Electric Utilities Corporation, Docket No. C-2016-2580526, p. 10 (Jan. 19, 2017)).

73. In the spring of 2017, PPL resumed construction activities at the Conestoga Substation, without involving Amtrak in meetings about construction progress. (Ex. B at 153:8- 24, 154-155).

## IV. THE CONDEMNATION FILING

74. Amtrak considered alternatives to condemning the Conestoga Substation, including but not limited to constructing a new substation at a different location. (Ex. F at 21, 87-91; Ex. E at 135-137).

75. Amtrak's decision to condemn the Substation was, in part, financial. (Ex. A at 91:13-92:11, 95:1-11; Ex. F at 71:23-72:12; Hornung-30, SOF, Exhibit P; Ex. B at 149-151).

76. Amtrak's Board of Directors voted to approve the condemnation of the Conestoga Substation at its January 26, 2017 meeting. (Hornung-37, SOF, Exhibit Q).

77. On March 3, 2017, Amtrak sent PPL a letter stating that it would purchase the Conestoga Substation for $2 million. (Ex. A at 63:22-24, 64-66; Hornung-22, attached hereto as Exhibit R; Ex. D at 167:8-24).

78. PPL did not agree to sell the Conestoga Substation to Amtrak. (Ex. A at 64:11- 24, 65, 66:9-12; Ex. D at 167:8-24, 168:1-4; Ex. F at 175:5-10).

79. On April 17, 2017, Amtrak filed a Complaint for Condemnation and Declaration of Taking with this Court to exercise its power of eminent domain pursuant to 49 U.S.C. § 24311. (Docs. 1 & 4).

80. On April 18, 2017, Amtrak deposited $2 million with the Court as an estimate of just compensation. (Ex. E at 176:15-18; Doc. 13).

81. The parties have stipulated to the authenticity of all deposition exhibits. (ECF 43.)

## **DISCUSSION**

Because Amtrak is a government-sponsored corporation and not a government entity, Amtrak's eminent domain power is limited to the terms of its statutory grant codified at 49 U.S.C. § 24311.. *National Railroad Passenger Corp. v. 3.44 Acres,* 266 F. Supp. 3d 63, 67 (D.D.C. 2017)("3.44 Acres"). That statutory grant provides:

§ 24311. Acquiring interests in property by eminent domain

**(a) General authority**.--**(1)** To the extent financial resources are available, Amtrak may acquire by eminent domain under subsection (b) of this section interests in property--

**(A**) necessary for intercity rail passenger transportation, except property of a rail carrier, a State, a political subdivision of a State, or a governmental authority; or

(**B**) requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak.

49 U.S.C. § 24311.

In short, Amtrak's statutory grant permits the condemnation of "interests in property" that are "necessary for intercity passenger rail transportation." "Interests in property" refers to the parcel that Amtrak seeks to take and not to the means of acquiring that property. *3.44 Acres,* 266 F. Supp. 3d at 68. Necessity means a "significant relationship" of the parcel with Amtrak's provision of intercity rail passenger transportation. *Id.* citing *Nat'l R.R. Passenger Corp v. Two Parcels of Land,* 822 F. 2d 1261,1265. (2d Cir. 1987). "In other words, the taking must have some direct nexus to Amtrak's goals, which as set forth by statute, include minimizing federal subsidies, 49 U.S.C. § 24101(c)(1)-(2), and maximizing 'the use of its resources, including the most cost-effective use of employees, facilities and real property.'" *3.44* Acres, 266 F. Supp. 3d at 69 citing 49 U.S.C. § 24101(c)(12).

Therefore, we first must examine the nature of the property Amtrak wishes to condemn and whether it bears a direct nexus to Amtrak's goals. The parties have stipulated that the Conestoga Substation is an electrical power substation that is directly

connected to the Safe Harbor Hydroelectric Facility ("Safe Harbor") and that receives power at 25 Hertz for Amtrak's use. (SOF, ¶ 6). The parties have further stipulated that Amtrak is the only PPL customer served by the 25 Hertz power from the Conestoga Substation and that Amtrak uses the 25 Hertz power from the Conestoga Substation to power the south end of its Northeast Corridor ("NEC") and its Harrisburg Line. (SOF, ¶ ¶ 14, 15). According to the parties' Stipulation, the NEC is the busiest rail passenger route in North America with Amtrak running up to 157 trains on the NEC each day. (SOF, ¶¶ 16, 17). The Conestoga Substation has served Amtrak's railroad operations since Amtrak commenced operations on the NEC. (SOF, ¶ 18.) Power from the Conestoga Substation is delivered to Amtrak via seven transmission lines that emanate from the Substation. (SOF, ¶ 19.) Of the seven total lines, four of the lines that exit the Conestoga Substation feed Amtrak's NEC mainline at Perryville, Maryland and two lines feed Amtrak's Harrisburg line at Parkesburg, Pennsylvania. (SOF, ¶ 23.) Amtrak already owns three of the seven transmission lines as well as three of the seven electric transformers at the Substation. (SOF, ¶ 21.) At the time Amtrak filed this action, the Conestoga Substation provided approximately 22% of the power for Amtrak's operation of the south end of the NEC. (SOF, ¶ 28.) The parties agree that most of the equipment installed at the Conestoga Substation is from the 1930s and quite deteriorated. (SOF, ¶ 29). They further agree that in the event of an equipment failure at the Conestoga Substation, Amtrak has no substitute for the power provided by the Conestoga Substation. (SOF, ¶ 30). Based on these stipulations there can be little doubt that the Conestoga Substation is an asset necessary for Amtrak to properly function.

The Court further finds that the Substation bears a direct nexus with Amtrak's statutory goals of minimizing federal subsidies, 49 U.S.C.§ 24101(c)(1)-(2), and maximizing the use of its resources, including the most cost-effective use of employees, facilities and real property. *Id.* at § 24101(c)(12). Amtrak determined that it would be more cost-effective to simply acquire the Substation rather than have to continue to litigate PPL's constant increased tariff filings before the PUC. Indeed, in the PPL's most recent tariff filing, PPL sought the PUC's permission to increase the LPEP rate schedule from the 2011-2015 PUC-adjudicated rate of $37,100 per month to approximately $319,000 per month. (SOF, ¶ 69.) This proposed increase was in response to PPL having increased its projection of total upgrade costs for the Substation from $18 million to $24 million. (SOF. ¶ 61.) The record reveals that Amtrak predicted this rate would cost it $63.7 million over 20 years, whereas simply purchasing the Substation and performing the upgrades itself would cost it exponentially less. (ECF 44-2 at Ex.4). Although submits it has already incurred approximately $9 million in upgrade costs, PPL can seek to recoup these costs in the just compensation phase of this litigation. Therefore, the Court finds that Amtrak's condemnation of the Conestoga Substation and taking a fee simple interest in the property directly furthers Amtrak's statutory goals of minimizing federal subsidies and making the most cost-effective use of its employees and facilities and real property.

PPL argues that Amtrak's ownership of the Conestoga Substation is not necessary for intercity rail passenger transportation because Amtrak is already receiving electricity from the Substation and can continue to receive its electricity

distribution from the Substation through its current leasehold agreement with PPL. A

similar argument was rejected by the Court in *3.44 Acres.*

> But, again, § 24311 requires that the *property* have a significant connection with Amtrak's transportation mission. Assuming the requisite connection, the Court is not in a position to assess whether a lease, an easement, or fee simple ownership is the optimal way to further that mission. Indeed, the legislative history of Amtrak's eminent domain provision expressly contemplates, as a legitimate justification for using eminent domain, the inferiority of leaseholds to outright ownership[.] . . . Fluorine's admitted willingness to provide a property interest *less* than fee simple ownership does not undermine the soundness of Amtrak's conclusion or its compliance with § 24311.

*3.44 Acres*, 266 F. Supp. 3d at 73. (emphasis in original.)

Indeed, PPL's prior offer to sell the Conestoga Substation to

Amtrak in 2010 and the provision in the Settlement Agreement of the Rate

Case that both the PPL and Amtrak would consider the purchase of the

Substation by Amtrak (SOF, ¶ 52), is evidence that even PPL believed

that ownership and operation of the Substation by Amtrak was feasible

and practical.

PPL also argues that Amtrak's real motive behind condemning the Substation is

purely profit-driven as, according to PPL, Amtrak is seeking to avoid the increased tariff

filings by the PPL. Again, a similar argument was rejected by the Court in *3.44 Acres*.

> Citing the Amtrak's Board identification of a high estimated rate of return for the REA Building, Fluorine contends that Amtrak had ulterior motives for the acquisition. This fact would be troubling if profit were the *only* evident purpose for Amtrak's acquisition. But, as explained, the REA Building has a clear nexus with Amtrak's transportation related-goals, and the mere consideration of economic factors cannot defeat an otherwise valid taking. Amtrak's takings power is

> restricted by the terms 24311, but so long as it does not
> exceed its statutory power, Amtrak is not *forbidden* from
> considering additional factors before seeking to acquire a
> multi-million-dollar property.

*3.44 Acres*, 266 F. Supp. 3d at 73. (emphasis in original.)

Similarly, the Court has already found that the Conestoga Substation has a clear nexus with Amtrak's transportation-related goals. That being the case, Amtrak is clearly not forbidden from considering economic factors in its decision to acquire the Substation. The parties stipulated that increasing the proposed rate per month from $37,100 to $252,000 would represent a $2.6 million annual increase in Amtrak's operating expenses. (SOF, ¶ 48). In addition, as observed by the Court in *3.44* Acres, Amtrak's eminent domain provision "expressly contemplates, as a legitimate justification for using eminent domain, the inferiority of leaseholds to outright ownership." *3.44 Acres*, 266 F. Supp. 3d at 73.

PPL next argues that Amtrak failed to fulfill its statutory obligation under 49 U.S.C. § 24311(a)(2) to acquire the Substation by contract before exercising its power of eminent domain. That section provides:

> (2) Amtrak may exercise the power of eminent domain only if it cannot—
>
> (A) acquire the interest in the property by contract; or
>
> (B) agree with the owner on the purchase price for the interest.

49 U.S.C. § 24311(a)(2).

Here, the stipulated record reveals Amtrak took every measure it could to either acquire the interest in the Substation by contract or agree with PPL on a purchase price.

As part of the settlement of the Rate Case in September, 2015, the parties agreed to consider the purchase of the Substation by Amtrak. (SOF, ¶ 52.) In July, 2016, Amtrak requested that PPL provide a price for the sale of the Substation to Amtrak. (SOF, ¶ 63.) PPL did not respond to Amtrak's request. (SOF, ¶ 64.)  In fact, PPL determined that it would not agree to sell the Substation to Amtrak (SOF, ¶ 65.) According to PPL, "PPL Electric is not in the business of selling its electric facilities to customers." (SOF, ¶ 66.) Based on these stipulated facts, there were no further actions Amtrak could have taken to acquire or purchase the Substation before proceeding with eminent domain proceedings.

PPL also argues that Amtrak's condemnation is a violation of the parties' settlement agreement of the Rate Case. In the first instance, that agreement expired in September, 2016. (SOF, ¶¶ 52, 53). Second, there is nothing in that settlement agreement to show that Amtrak waived its right to conduct eminent domain proceedings.  Indeed, any such waiver would be invalid.  *See Georgia v. Chattanooga*, 264 U.S. 472, 480 (1924) ([The power of eminent domain] "cannot be surrendered, and if attempted to be contracted away, it may be resumed at will.")

PPL also argues that Amtrak cannot condemn the Substation without first receiving a certificate of public convenience and necessity from the PUC. There is no language anywhere in Amtrak's statutory grant (or in any Pennsylvania statute) that would require Amtrak, as a government-sponsored entity, to obtain a certificate of public convenience and necessity before it could condemn property and facilities owned by public utilities. The only requirement Amtrak must meet is that the property to be condemned must be "necessary for intercity passenger rail

transportation." Indeed, federal courts have confirmed that the power of eminent domain extends to property and facilities owned and operated by public utilities. *See, e.g.*, *Int'l Paper Co. v. United States*, 282 U.S. 399, 407 (1931); *United Railways & Elec. Co. of Baltimore v. W.*, 280 U.S. 234, 249 (1930); *Gulf Power Co. v. United States*, 187 F.3d 1324, 1330 (11th Cir. 1999); *Winooski Hydroelectric Co. v. Five Acres of Land in E. Montpelier & Berlin, Vt.*, 769 F.2d 79 (2d Cir. 1985); *United States v. Brooklyn Union Gas Co.*, 168 F.2d 391, 392 (2d Cir. 1948).

By contrast, Section 7(h) of the Natural Gas Act, 15 U.S.C. 717(h), specifically grants the right of eminent domain to an entity only after it has received from FERC a certificate of public convenience and necessity under Section 7(c). Amtrak's statutory grant contains no such language.

Even the PUC does not believe it needs to give its approval before Amtrak may begin eminent domain proceedings. The PUC dismissed without prejudice PPL's tariff filing immediately after Amtrak gave notice of these condemnation proceedings. (ECF 36-1.) Nowhere in its Opinion dated November 8, 2017 did the PUC assert that its approval was required before Amtrak could condemn the Substation. In its Opinion and Order, the PUC advised PPL that "[i]f Amtrak prevails in the eminent domain proceeding . . .PPL would be able to litigate the issue of what is owed by Amtrak for the taking of the substation and for PPL's recovery of, approximately $9 million in costs associated with the completed upgrades, *before the District Court*." (*Id.* at 24) (emphasis added.) Alternatively, the PUC stated that "[s]hould PPL prevail on the merits that would result in PPL's continued ownership and operation of the Conestoga Substation, they are

encouraged to promptly return to the Commission for any appropriate proceedings regarding the rates to be charged under the LPEP schedule." (*Id.* at 24-25.)

PPL next argues that under Section 203 of the FPA, FERC must first authorize the transfer of the Substation from PPL to Amtrak. That section provides that "[n]o public utility shall, without first having secured and order of the Commission authorizing it to do so---(A) sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $10,000,000." 16 U.S.C. § 824b(a)(1)(A). As pointed out by PPL, Section 203 applies to any transfer of FERC-jurisdictional utility property, including transfer by condemnation. *See Pub. Serv. Co. of Colo.*, 149 FERC P 61,228 at P 33 (2014) ("A transfer by condemnation of facilities subject to the Commission's jurisdiction under the FPA cannot be effectuated unless the Commission has authorized the transfer under section 203 of the FPA.")

However, by its own terms, Section 203 of the FPA applies only to transfers of facilities valued in excess of $10 million. 16 U.S.C. § 824b(a)(1)(A). The parties have agreed to take discovery on determining the value of the Substation after the Court rules on Amtrak's motion for partial summary judgment. As of now, the parties have stipulated that in 2010, PPL offered to sell the Substation to Amtrak for $1.7 million. (SOF at ¶ 33.) and that on March 3, 2017, Amtrak sent PPL a letter stating that it would purchase the Conestoga Substation for $2 million. (Id. at ¶ 77.) Although PPL argues that it has met the $10 million threshold because it alleges that it has spent over $10 million towards capital improvements needed at the Substation, just because PPL may have spent $10 million on capital improvements to the Substation does not mean that

the actual value of the Substation is in excess of $10 million. Therefore, because the value of the Substation appears to be substantially less than $10 million, Section 203 of the FPA is not applicable. However, the Court will revisit the issue if, after completing discovery on the actual value of the Substation, PPL can demonstrate that the actual value is in excess of $10 million.

Finally, PPL argues that the taking of the Substation by Amtrak will prevent PPL from performing its obligation with third-parties under the Interconnection Service Agreement and the Transmission Contract. See SOF, ¶¶ 26, 27. The Court does not agree. In the first instance, PPL apparently was not concerned about these obligations when it offered to sell Amtrak the Conestoga Substation in 2010. Second, Amtrak specifically reserved to PPL a floating easement which Amtrak defined as an "easement sufficient for PPL's fulfillment of its obligations to transmit power through the Conestoga Substation pursuant to the Transmission Contract between PPL, Safe Harbor Water and Power Corporation, and Baltimore Gas and Electric Company dated October 1, 1960, as amended by Supplemental Agreement dated March 13, 1989" and "the Interconnection Service Agreement among PJM Interconnection, L.L.C. and Safe Harbor Water Power Corporation and PPL Electric Utilities Corporation effective January 7, 2013." (Compl. at ¶¶ 9-10.)  Therefore, the floating easement should allow PPL to continue to perform its obligations to third parties without any restrictions until the obligations under these contracts can be transferred to Amtrak

The Court notes that Safe Harbor Water Power Corporation has filed an amicus brief requesting the Court to "ensure that Safe Harbor retains the same rights it currently possesses to deliver, sell and settle with the PJM Markets via the Conestoga

Substation." (ECF 55-1, p.5.)  Therefore, Safe Harbor requests "that a comprehensive transition plan be developed under the auspices of and approval by this Court" that "preserves all of the stakeholders' current expectations and business arrangements." (*Id.* at p. 4.)

The record reveals Amtrak already owns approximately 70 electric substations on the Northeast Corridor that support Amtrak's intercity rail passenger service. (SOF, Ex. A at 105:8-24; SOF, Ex. E at 174:2-8). Thus, owning an electric substation is not a new experience for Amtrak. That being said, Safe Harbor ( as well as the remainder of the third-parties in contract with PPL) can rest assured that the Court will do everything in its power to secure their interests during the change in ownership of the Conestoga Substation.