**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL RAILROAD PASSENGER** | | |
| **CORPORATION** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.   17-1752** |
| | : | |
| **4.0446 ACRES MORE OR LESS OF** | : | |
| **LAND AND FIXTURES and PPL** | : | |
| **ELECTRIC UTITLTIES CORP.** | : | |
| | : | |

**MEMORANDUM**

**SCHMEHL, J.  /s/ JLS**                                      **DECEMBER 7, 2021**

This is a Complaint for Condemnation and Declaration of Taking brought by

National Railroad Passenger Corporation ("Amtrak") pursuant to 49 U.S.C. § 24311.

Amtrak seeks to condemn an electric power substation located in Lancaster County,

Pennsylvania, known as the Conestoga Substation. Prior to this condemnation, fee title

to the Conestoga Substation was owned by defendant PPL Electric Utilities Corp.

("PPL").  As required by 49 U.S.C. § 24311(b)(1), Amtrak filed a declaration of taking (a)

stating "the public use for which the interest is taken"; (b) describing the property; (c)

stating the interest in the property; (d) "showing the interest taken"; and (e) estimating

just compensation for the interest taken. See Decl. of Taking (ECF 4.) Amtrak also

deposited $2 million with the Court as an estimate of just compensation. (*Id*. ¶ 19.)

In a Memorandum and Order dated March 6, 2019, the Court found that Amtrak

properly used its eminent domain powers to condemn the Conestoga Substation,

leaving the issue of just compensation due to PPL. Presently before the Court is

Amtrak's motion for partial summary judgment on the issue of whether the cost of

certain construction work in progress ("CWIP") for upgrades on the Conestoga Substation that PPL paid for and procured prior to the condemnation should be included in the amount of just compensation owed to PPL. PPL defines its CWIP as its investment in equipment that was not installed, its engineering and design costs as well as its direct and indirect overhead costs related to the upgrade project.

Amtrak argues that the cost of CWIP should not be included because Amtrak did not condemn PPL's CWIP. For the reasons that follow, the motion for partial summary judgment is denied.


## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d

Cir. 2010) (citing <u>Reliance Ins. Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

The parties have stipulated to the following facts ("SOF"):

## I. THE PARTIES

1. Amtrak is a corporation that was authorized to be created by the Rail Passenger Service Act of 1970, 49 U.S.C. § 24101 et seq., located at One Massachusetts Avenue, NW, Washington, DC 20001. (ECF 43, ¶ 11 ).

2. PPL is a Pennsylvania corporation with its principal place of business at 2 North Ninth Street, Allentown, Pennsylvania 18101. (ECF 43, ¶ 2).

3. PPL is a public utility regulated by the Pennsylvania Public Utility Commission ("PUC") under the Pennsylvania Public Utility Code, 66 Pa.C.S. § 101 et seq., and by the Federal Energy Regulatory Commission ("FERC") under the Federal Power Act, 16 U.S.C. § 791a et seq. (ECF 43, ¶ 3).

## II. THE SUBJECT PROPERTY

4. Before the filing of this condemnation action, PPL was the owner in fee simple of the land parcel and the improvements thereon at Powerhouse Road, Manor Township, Lancaster County, Pennsylvania, tax parcel 410-11106-0-0000, which was conveyed via the Special Warranty Deed attached to the Complaint as

Exhibit A and recorded as Instrument number 6206115 (the "Tax Parcel"). (ECF 43, ¶ 4).

5.  The premises acquired by Amtrak is that portion of the Tax Parcel which is approximately 575 feet in width and 380 feet in depth, comprising 4.0446 acres, and which comprises the Conestoga Substation power station (the "Conestoga Substation"). (ECF 43, ¶ 5).

6.  The Conestoga Substation is an electrical power substation that is directly connected to the Safe Harbor Hydroelectric Facility ("Safe Harbor") and that receives power at 25 Hertz for Amtrak's use. (ECF, ¶ 6).

7.  The Conestoga Substation was built in 1934. (ECF, ¶ 12).

8.  Most of the equipment installed at the Conestoga Substation is from the 1930s and quite deteriorated. (ECF 43, ¶ 29).

9.  Until the filing of the Declaration of Taking in this matter, PPL, through its predecessors, owned the fee interest in the Conestoga Substation since it was built in 1934. (ECF 43, ¶ 13).

10. Prior to the condemnation, Amtrak was the only PPL customer served by the 25 Hertz power from the Conestoga Substation. (ECF 43, ¶ 14).

11. Amtrak uses the 25 Hertz power from the Conestoga Substation to power the south end of its Northeast Corridor ("NEC") and its Harrisburg Line. (ECF 43, ¶ 15).

12. Prior to this condemnation, Amtrak paid PPL a tariff rate approved by the PUC for the service PPL provides through the Conestoga Substation. (ECF 43, ¶ 25

## III. INTERACTIONS BETWEEN THE PARTIES REGARDING THE SUBSTATION

13. In or around 2011, PPL informed Amtrak that it had begun taking steps to upgrade the deteriorated equipment at the Conestoga Substation, (ECF 43, ¶ 40).

14. Amtrak and PPL agreed that upgrades were necessary. (ECF 43, ¶ 41).

15. From 2011 through 2015, Amtrak paid a monthly customer charge to PPL of $37,100 per month for the service it received from PPL through the Conestoga Substation under a tariff approved by the PUC (the "LPEP Tariff"). (ECF 43, ¶ 35).

16. The LPEP Tariff included the cost to maintain the site, recoupment of the cost of investments PPL made at the site (including the upgrades), return on those investments, taxes PPL paid, and depreciation. (ECF 43, ¶ 37).

17. The LPEP Tariff did not include the purchase of electricity. (ECF 43, ¶ 39).

18. Because Amtrak was the sole rate payer for the Conestoga Substation, Amtrak was responsible for the cost of the upgrades under the LPEP Tariff. (ECF 43, ¶ 43).

19. Between approximately 2011 and 2015, PPL and Amtrak had weekly meetings regarding the scope of the proposed upgrades and options for funding the upgrades. (ECF 43, ¶¶ 44-45).

20. Amtrak and PPL did not come to an agreement on how to fund upgrades to the Conestoga Substation. (ECF 43, ¶ 46).

21. In 2015, PPL initiated rate proceedings before the PUC to adjust Amtrak's monthly customer charge from $37,100 to $252,000 (the "Rate Case"). (ECF 43, ¶ 47).

22. The proposed rate of $252,000 per month would not go into effect until the upgrades were completed and represented a $2.6 million annual increase in Amtrak's operating expenses. (ECF 43, ¶ 48).

23. PPL asserted before the PUC that it required an increased rate based on the capital improvements it proposed at the Conestoga Substation, which at that time PPL projected would cost $18 million. (ECF 43, ¶ 49).

24. The new rate was comprised of the same components as the rate that Amtrak had been paying from 2011 through 2015 (i.e., the cost to maintain the site, recouping cost of investments made at the site, return on those investments, taxes, and depreciation), which would increase as a result of the upgrades. (ECF 43, ¶ 50).

25. Amtrak intervened in the Rate Case and opposed PPL's requested rate increase. (ECF 43, ¶ 51).

26. In September 2015, Amtrak and PPL reached a settlement of the Rate Case on the following basis: a. Amtrak agreed to pay PPL a monthly rate of $126,323.59 until September 1, 2016 or until the parties agreed upon a new rate. (ECF 43, ¶ 52.a). b. That rate consisted of the previous monthly customer charge of $37,100, plus a charge of approximately $89,000 as an advance payment to PPL relating to proposed upgrades. (ECF 43, ¶ 52.b). c. The Settlement Agreement required both parties: [T]o continue to work together to resolve all open issues regarding the upgrade of the Conestoga Substation, including possible alternative resolution regarding the final scope, timing, and costs of the upgrades needed for the Conestoga Substation. Both parties agree to consider all potential

solutions, including, but not limited to, direct funding by Amtrak, purchase of the Conestoga Substation by Amtrak, recovery of costs through base rates, and/or transfer of 2 existing Amtrak transformers from the Metuchen Station to the Conestoga Substation. (ECF 43, ¶ 52.c).

27. The Settlement Agreement further provided: If PPL Electric and Amtrak are unable to reach an agreement by September 1, 2016, PPL Electric will undertake all improvements needed for the Conestoga Substation that are in its opinion necessary or proper to provide safe and reliable service to Amtrak, and will make an appropriate tariff filing to fully recover those costs. PPL Electric agrees to serve Amtrak with an electronic copy of the tariff filing upon submission to the Pa. PUC. Amtrak reserves all rights to contest the tariff filing before the Pa. PUC. (ECF 43, ¶ 53).

28. PPL determined that it would not agree to sell the Substation to Amtrak. (ECF 43, ¶ 65).

29. "PPL Electric is not in the business of selling its electric facilities to customers." (ECF 43, ¶ 66).

30. From September 2015 to March 2017, Amtrak in fact paid PPL the $126,323.59 required by the Settlement Agreement.

31. Amtrak and PPL were unable to reach a final agreement by September 1, 2016. (ECF 43, ¶ 67).

32. On October 5, 2016, PPL filed a tariff with the PUC to adjust Amtrak's customer charge for the Conestoga Substation (formally known as the "LPEP rate schedule"). (ECF 43, ¶ 68).

33. In that filing, PPL sought the PUC's permission to increase the LPEP rate schedule from the 2011-2015 PUC-adjudicated rate of $37,100 per month to approximately $319,000 per month. (ECF 43, ¶ 69).

34. Amtrak filed a Formal Complaint challenging that rate increase on December 19, 2016. (ECF 43, ¶ 70).

35. In that Complaint, Amtrak stated that it anticipated acquiring the Conestoga Substation by eminent domain instead of litigating PPL's tariff filing before the PUC. (ECF 43, ¶ 71).

36. The PUC suspended the effectiveness of any rate increase until at least October 1, 2017. (ECF 43, ¶ 72).

37. In the spring of 2017, PPL resumed construction activities at the Conestoga Substation, without involving Amtrak in meetings about construction progress. (ECF 43, ¶ 73).

## IV. THE CONDEMNATION FILING

38. On March 3, 2017, Amtrak sent PPL a letter stating that it would purchase the Conestoga Substation for $2 million. (ECF 43, ¶ 77).

39. PPL did not agree to sell the Conestoga Substation to Amtrak. (ECF 43, ¶ 78).

40. On April 17, 2017, Amtrak filed a Complaint for Condemnation and Declaration of Taking with this Court to exercise its power of eminent domain pursuant to 49 U.S.C. § 24311. (ECF 1 & 4).

41. Amtrak deposited $2 million with the Court as an estimate of just compensation. (Doc. 43, ¶ 80).

42. On March 6, 2019, this Court granted Amtrak's Motion for Partial Summary Judgment and confirmed Amtrak's Authority to condemn the Conestoga Substation. (ECF 62).

## V. THE CONSTRUCTION WORK IN PROGRESS

43. Amtrak and PPL agree that Amtrak must provide just compensation to PPL.

44. The Parties disagree on what constitutes just compensation, its permissible measures, and to some degree, how it may be valued in this dispute.

45. PPL contends its investment in equipment and engineering to improve the Substation may be evaluated as part of its claim.

46. PPL refers to its investment in equipment, engineering, and other costs toward the upgrades as construction work in progress or "CWIP." (See Deposition Transcript of Joseph G. Kettell, April 14, 2021, ECF 100, Ex. B at Ex. 1 at 25-27).

47. In his report, PPL's valuation expert has included approximately $10.7 million worth of CWIP in his calculation of the fair market value of the Conestoga Substation.2 (See id. at 27).

48. Of this total, $3,169,705 is for PPL's purported "direct and indirect" overhead costs related to the upgrade project. (Id.).

49. Amtrak submits it did not condemn PPL's direct and indirect overhead costs, and the Declaration of Taking does not identify these items as being acquired by Amtrak. (ECF 4).

50. Approximately $5.5 million of the CWIP is the invoice for equipment purchased for the Substation by PPL and not installed. (Kettell Tr. at Ex. 1 at 27).

51. Amtrak submits it did not condemn the offsite equipment purchased for the Substation by PPL but not installed, and the Declaration of Taking does not identify this equipment as property being acquired by Amtrak. (ECF. 4).

52. The equipment purchased for the Substation by PPL is still in PPL's possession. (Kettell Tr. at 24:16-24; Deposition Transcript of T. Scott Vandervliet, April 14, 2021, attached hereto as Exhibit C, at 32:9-16) (hereinafter "Vandervliet Tr.").

53. The remaining amount (approximately $2.0 million) represents other engineering/design costs for which PPL paid vendors. (Kettell Tr. at Ex. 1 at 27). Amtrak submits it did not condemn the engineering and design work for the Substation and the Declaration of Taking does not identify this intellectual property as being acquired by Amtrak. (ECF 4).

54. The intellectual property purchased and/or created by PPL, like its engineering drawings, for the upgrades to the Substation remains in PPL's possession. (See Kettell Tr. at 61:9-21, Ex. 1 at 27; see also ECF 4).

55. Amtrak contends it does not have the ownership, possession, or benefit of any of the CWIP. (ECF 4).

56. PPL's valuation expert described CWIP as being a term used in business valuation and business acquisitions. (Vandervliet Tr. at 32:22-33:9).

57. When CWIP is valued as part of the sale of a business, it is expected that the purchaser of the business also purchases the CWIP and has the benefit of it after the sale. (Kettell Tr. 59:16-60:6) (Vandervliet Tr. 34:3-8).

58. PPL added the value of the CWIP to its estimate of the value of the Conestoga Substation to arrive at its estimate for just compensation owed to PPL. (Kettell Tr. 58:4-14) (Vandervliet Tr. at 31:15-32:1).

59. The CWIP is not depreciated in PPL's expert report. (Vandervliet Tr. 33:10-13).

60. The parties hereby stipulate to the authenticity of all deposition exhibits.


**DISCUSSION**

Although the federal government has the power to take private property for public use pursuant to eminent domain, the Fifth Amendment requires the federal government to provide "just compensation" to the owner of the property. *Tennessee Gas Pipeline Company, LLC v. Permanent Easement For 7.053 Acres, Permanent Overlay Easement For 1.709 Acres and Temporary Easements For 8.551 Acres in Milford and Westfall Townships, Pike County, Pennsylvania, Tax Parcel Numbers*, 931 F. 3d 237, 243-44 (3d Cir. 2019). "Under the Fifth Amendment, just compensation generally means the 'fair market value of the property on the date it is appropriated' and nothing more." *Id*. (citation omitted). Under this standard, the owner is entitled to receive "what a willing buyer would pay in cash to a willing seller" at the time of the taking. *United States v. Miller*, 317 U.S. 369, 374 (1943). "The basic principle underlying the constitutional requirement of 'just compensation' is one of indemnity. The condemnee 'is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but he is entitled to no more.'" *United States v. 564.54 Acres of Land, More or Less, In Monroe and Pike Ctys., Com. of Pennsylvania*, 506 F. 2d 796, 799 (3d Cir. 1974) quoting *Olson v. United States*, 292 U.S. 246, 255 (1934). The term "fair market

value" "'is not an absolute standard nor an exclusive method of valuation.'" *Id.* (citations omitted.) While the Fifth Amendment entitles the property owner to the fair market value of his property, it does not guarantee him a return on his investment. *United States ex rel. and for Use of Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 285 (1943). Fair market value can be determined through one of three valuation methods—the comparative sales approach, the capitalization of income approach, or the cost approach. *Foster v. United States*, 2 Cl. Ct. 426, 447 (Fed. Cl. 1983).

Just compensation does not normally include consequential damages like lost profits or development costs. *Tennessee Gas Pipeline Company,* 931 F. 3d at 244 citing *United States v. Miller*, 317 U.S. 369, 376 (1943). The reason consequential damages are not considered as just compensation is because "'the sovereign need only pay for what it actually takes rather than for all that the owner has lost.'" *Tennessee Gas Pipeline Company,* 931 F. 3d at 244 (citations omitted.); *see also, United States v. Petty Motor Co.,* 327 U.S. 372, 377–78 (1946) ("Evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."). As ruled by our Court of Appeals, past costs for repairs and improvements on a property are not relevant to show the value of the property. *Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1943). This is because, costs for repairs and improvements are personal to the owner and not part of the value of the property being taken. *Id*.

Pursuant to this authority, Amtrak argues that it only condemned 4.0446 Acres, of the Tax Parcel and all improvements and fixtures thereon heretofore held by PPL, i.e. the Conestoga Substation and therefore it should only have to pay just

compensation for that tangible property.  ECF 4.  Amtrak points out that it did not condemn any of the offsite and uninstalled equipment purchased by PPL nor any intangible property related to the Conestoga Substation such as engineering and design costs, and that all this intangible property is still owned by PPL. (SOF, ¶¶ 53, 55, 56). Amtrak further points out that PPL did not raise any objection to the description of the parcel to be condemned. Finally, Amtrak contends that PPL has already been compensated for a portion of these costs through the interim settlement whereby Amtrak paid over $126,000 per month to PPL from September 2015 through March, 2017.based on PPL's anticipated upgrades to the Substation. (SOF, ¶ 26).

PPL responds that Amtrak's taking of the Conestoga Substation was not a typical taking of private property by eminent domain to which a market value can be easily ascertained but rather was a taking of a special purpose utility facility which, because of its uniqueness, lacks any type of traditional marketplace. As explained by our Court of Appeals:

> If the government condemns property for which there is a ready market (commodities are a classic example) payment of the fair market value is complete indemnity since, whatever its intended use, the condemnee can readily replace it in the marketplace. Some property, from its very nature, has no marketplace. **An example is a single purpose facility requiring a large capital investment, such as a power generating station** Such facilities are usually operated for profit. When they cannot be valued in the marketplace a fair measure of the government's obligation to indemnify may be the present value of capitalized future earnings.

*United States v. 564.54 Acres,* 506 F. 2d 796, 799 (3d Cir. 1974). (emphasis added.)

PPL also directs the Court's attention to the United States Supreme Court decision in *Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893). In that case, the United States condemned a lock and a dam operated by the Monongahela Navigation Company ("MNC"). MNC had received a vested franchise from the Commonwealth of Pennsylvania to collect tolls. The Supreme Court recognized that the United States would have the opportunity to exact the same tolls MNC had been receiving. Under these circumstances, the Supreme Court held that MNC was not only entitled to the value of the lock and dam at the time of the taking, but MNC was also entitled to the value of the franchise to take tolls "because it is a substantial element in the value of the property taken." *Id*. at 37. The Court reasoned that "[b]ecause congress has power to take the property it does not follow that it may destroy the franchise without compensation." *Id*.

Similarly, in *Brooks-Scanlon Corp. v. United States*, 265 U.S. 106 (1924) and *De Laval Steam Turbine Co. v. United States*, 284 U.S. 61 (1931), the United States took the contract rights and materials necessary to build ships from the contract holders for its own benefit during wartimes with the intention of continuing the contracts. As a result, the Supreme Court held that the contract holders were entitled to recover not only the cost of the ships themselves but also the profits they would have made under the contracts absent the taking. *Brooks-Scanlon Corp*., 265 U.S. at 119, 122; *De Laval Steam Turbine Co*., 248 U.S. at 71.

In *United States v. 0.88 Acres of Land*, 670 F. Supp. 210 (W.D. Mich. 1987), the United States condemned a privately held tract of land containing a canoe and boat livery, service station and grocery in order to establish the Sleeping Bear Dunes

National Lakeshore (which is adjacent to the Sleeping Bear Dunes National Park.)  The

landowners sought compensation not only for the land but also "damages for the loss of

the entire business, including items used in furtherance of the business and its goodwill

and going-concern value." *Id*. The Court noted that it had previously concluded that

"damages for the loss of goodwill or loss of the going-concern value of a business are

not compensable unless the government has condemned the business property with the

intention of carrying on the business." *Id*. at 211. After reviewing the evidence, the Court

concluded that it was the government's intention to carry on the canoe and boat livery

business. It based its conclusion on the government's intent to construct facilities in

substitution for an existing business, to operate the new business under the

government's pervasive regulation and the fact that doing so would create a monopoly

situation from which the government would financially benefit. Therefore, the Court ruled

that the landowners were entitled to be "compensated for the loss of the business as a

whole, including any good will and going-concern value." *Id*. at 213.

Pursuant to these decisions, PPL argues that the Conestoga Substation is a

special purpose utility facility which, because of its uniqueness, cannot be valued in a

traditional marketplace. *See*, 4 *Nichols* on Eminent Domain, Chapter 12C.01. Amtrak's

experts have not argued otherwise. Further, PPL argues that since Amtrak is operating

the Conestoga Substation in the same manner as PPL did (serving only Amtrak with 25

Hertz power) but without having to pay a LPEP tariff, Amtrak must compensate it for its

CWIP.

The Conestoga Substation is clearly a special purpose utility facility in that it is

the only such facility in the country that provides its sole customer, Amtrak, with a 25

Hertz low frequency alternating current to power the south end of Amtrak's Northeast Corridor and its Harrisburg Line. (Doc. 43, ¶ 15). In addition, there is no dispute that the Conestoga Substation has "Black Start" capability because it is the only facility capable of restoring power to the 25 Hz system through Safe Harbor in the event of a power outage.

Significantly, although Amtrak did not *per se* step into PPL's shoes by operating the Substation as a regulated public utility as did PPL and is therefore not receiving and will not receive in the future an income stream, Amtrak is still receiving a significant financial benefit from the takeover because it now, as owner of the Substation, no longer needs to pay a monthly LPEP rate for the use of the 25 Hertz current.[1] Instead, Amtrak essentially receives the use of the current free of cost. And it is a financial benefit that is not merely incidental to the taking, but one which Amtrak admitted was partly behind its decision to condemn the Conestoga Substation in the first place. ECF 61 at p.16 n. 75. Meanwhile, PPL has lost the source for its recovery for the costs it already sunk on the upgrade project.

Moreover, PPL cannot simply open up a new such facility at a different location since it is undisputed that there is no other market for 25 Hertz current other than for Amtrak. There is also no dispute that most, if not all, of the equipment purchased by PPL for upgrades at the Conestoga Substation was not "off the shelf" equipment that could be used by PPL at another site. Therefore, under the tenets of *Monongahela*

---

[1] Amtrak cites *Heir v. Delaware River Port Authority*, 218 F. Supp. 2d 627, 642-43 (D.N.J. 2002), wherein the Court held that where the Delaware River Port Authority condemned the land that Plaintiffs' franchise business was situated on, but not the franchise itself, and yet the condemnation still unquestionably destroyed Plaintiff's business, Plaintiffs were not entitled to just compensation for the loss of the business because the government did not step into the shoes of the Plaintiffs because it would not receive a future income stream. Here, while Amtrak will not receive a future income stream, it will receive the significant financial benefit of not having to pay a monthly tariff for the 25 Hertz current.

*Navigation Co.*, *supra, Brooks-Scanlon Corp.*, *supra, DeLaval Steam Turbine Co.*,
*supra, 564.54 Acres*, and *0.88 Acres of Land*, *supra*, the Court finds that by seizing the
special purpose Conestoga Substation and operating it in the same manner PPL did (by
providing 25 Hertz power for Amtrak's use) and receiving a significant financial benefit,
Amtrak should be responsible for not just the cost of the tangible property, but also for
PPL's CWIP related to the upgrade of the tangible property. [2]

Amtrak argues that none of PPL's experts followed the Third Circuit's suggestion
in *564.54 Acres* that the government's obligation to indemnify the owner of a single
purpose facility such as the Conestoga Substation is by calculating the "present value of
capitalized future earnings." *United States v. 564.54 Acres,* 506 F. 2d at 799. Instead,
Amtrak points out that PPL's experts contend that PPL "is entitled to dollar for dollar
compensation for the CWIP without regard to any theory of business enterprise, future
profits or regulated rates." (ECF 110 at p.8).

In the first place, there is no language in *564.54 Acres* that states that the **only**
way for the government to indemnify the owner of a single purpose facility is by
calculating the present value of future earnings. Second, the Court, at this time, takes
no position on the amount of just compensation PPL is entitled to or the proper method
of calculating that just compensation, The Court only rules, that, based on the state of

---

[2] The Court finds it noteworthy that Amtrak's expert on utility assets, Steven Dean, ASA, P.E., appraised the Conestoga Substation as of April 18, 2017, one day **after** the property was appropriated by Amtrak. By doing so, he did not take into account the use of the Substation as a utility property with CWIP. Instead, he appraised the Substation solely from the perspective of Amtrak and did not include the CWIP. Dean testified that as of April 18, 2017, which was post eminent domain, the Conestoga Substation was no longer under the control of PPL and prices were no longer set by the PUC. ECF 108-4 at pp. 59-62. Dean further opined that PPL "took a business risk when they engaged third party engineering design firms and purchased equipment that was specific to Conestoga." *Id*. at 62. As discussed, *supra*, however, the fair market value is to be ascertained on the date the property was appropriated (not the day after) when the property owner is entitled to receive what a willing buyer would pay in cash to a willing seller. *United States v. Miller*, 317 U.S. at 374. Moreover, PPL did not take a business risk in purchasing equipment and incurring engineering costs, but rather was obligated to do so by the parties' September 2015 Settlement Agreement. *See*, SOF 27, *supra*.

the jurisprudence, PPL is allowed to utilize the costs of its CWIP as one basis for its recovery.

Amtrak also argues that before PPL can recoup any of its CWIP costs and other costs associated with Substation upgrades in its rate base, the Pennsylvania Public Utility Code requires that: 1) PPL place the upgrades in service to the public; 2) PPL initiate a proceeding before the PUC to modify its tariff to enable its recovery of those costs; and 3) the PUC approve the requested modification of the tariff after an administrative proceeding permitting challenges to the tariff. 66 Pa. C.S. § 1315(a). Indeed, section 1315 of the Public Utility Code states:

> the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

66 Pa. C.S. §1315(a).

However, it was Amtrak's actions in condemning the Conestoga Substation that have effectively precluded PPL from ever satisfying any of these requirements. The condemnation took place midstream and before PPL could fully update the facility. The fact remains that PPL negotiated in good faith and met regularly with Amtrak over the cost of the upgrades. Pursuant to the Settlement Agreement of September 2015, Amtrak agreed that PPL would undertake all improvements needed for the Conestoga Substation that are in PPL's opinion necessary or proper to provide safe and reliable service to Amtrak and would make an appropriate filing to recover those costs. PPL

relied on Amtrak's acceptance of responsibility of paying for the upgrades (Doc. 43, ¶ 43) by investing in equipment that was never installed as a result of the taking. PPL also incurred engineering and design costs as well as direct and indirect overhead costs related to the upgrade project.

Again, as stated previously, the Court is taking no position on the amount of just compensation PPL is actually entitled to. In fact, the issue of just compensation is still to be decided and will in fact be referred to U.S. Magistrate Judge Timothy R. Rice for a mediation. For now, the Court only holds that PPL is entitled to claim as part of its just compensation the cost of its CWIP (comprised of PPL's investment in equipment that was not installed, its engineering and design costs as well as its direct and indirect overhead costs related to the upgrade project) minus any reimbursements for the CWIP that PPL received from the monthly payments Amtrak made, including the amount of $126,323.59 from September 2015 to March 2017. Of course, Amtrak will be entitled to full possession from PPL of the CWIP that the Court may order, or the parties may agree, for which Amtrak must compensate PPL.